In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-2038

GLENN E. JONES,

*Plaintiff-Appellant,*

*v.*

UNION PACIFIC RAILROAD COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3417—**David H. Coar**, *Judge.*

ARGUED MAY 23, 2002—DECIDED SEPTEMBER 10, 2002

Before FLAUM, *Chief Judge*, BAUER and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff Glenn E. Jones sued Union Pacific Railroad Company for violations of 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981, after he was dismissed from his position for gross insubordination following an incident at the rail yard where he worked. Jones moved for summary judgment and Union Pacific responded. The district court granted summary judgment in favor of Union Pacific. Jones appeals, arguing the district court erred procedurally in granting summary judgment *sua sponte* without giving him notice and an opportunity to respond; and that summary judgment should not have been granted in favor of Union Pacific because disputed

issues of material fact remain. We affirm, finding Jones has waived review of two of his three claims and that the district court properly granted summary judgment on the remaining claim.

## BACKGROUND

Glenn E. Jones, a black male, was employed by the Union Pacific Railroad. (Originally, Jones was employed by the Chicago North Western Transportation Company. The two companies merged in 1995.) From 1980 until 1998, Jones was a "coach cleaner", and after completing an apprenticeship in 1989, he was promoted to "carman".[1]

On April 28, 1998, Jones was involved in the incident which precipitated this suit. Jones worked a shift from Thursday through Saturday, 8:00 a.m. to 4:30 p.m. On the day in question, he left the shop where he worked at 5:00 p.m. and walked across the rail yard tracks toward an exit. At some point during the more than ten minutes it took for Jones to cross nearly all the tracks in the rail yard, Union Pacific Special Agent Brody observed Jones walking across the tracks.[2] (Under Illinois law,

---

[1] The duties of "coach cleaners" involve cleaning and servicing commuter rail cars after each trip. A "carman" performs a more in-depth and lengthy service on rail cars, referred to as "rehabilitation".

[2] Agent Brody was on surveillance duty at the Cal Avenue rail yard because of significant trespassing problems encountered by the railroad due, in part, to the fact that a City of Chicago auto impound yard abuts the rail yard. From 1997 to 1998, some fifty-eight persons were caught trespassing, and there were many incidents of theft from the automobiles in the impound yard.

Agent Brody reported: "observed a black male carrying a hand-bag walking south across the tracks towards 400 N. Francisco
(continued...)

railroad police have all the powers, while on railroad property, of a full police officer.)

As Jones was making his way across the yard, Agent Brody, in uniform, approached and stopped him to speak as he crossed the main rail line. Agent Brody asked Jones his reason for being in the yard and asked if he had identification.[3] Jones's and Agent Brody's accounts of what transpired after Agent Brody requested to see Jones's identification differ sharply.

According to Jones, when asked for identification he showed his employee identification. Jones responded indignantly, and although Agent Brody did not like his tone of voice, he initially made nothing of it. Jones then proceeded on his way until stopped again, on the sidewalk, by Agent Brody. While on the sidewalk, Jones stated that Agent Brody threatened his job, and asked to see his employee identification once again. Jones yelled for a neighborhood person to call the Chicago Police. (The sidewalk was not railroad property, and Agent Brody possessed no authority or police powers on public property.) The Chicago Police and Agent Brody's supervising officer, Special Agent Finger, arrived a few minutes later. Neither Jones nor Agent Brody were arrested.

---

[2]  (...continued)
Street. The black, male was wearing a knit hat and soiled clothing typical of the trespassers that frequent the yard."

[3]  Both parties cite Union Pacific's guideline for conducting "field interviews". The guideline provides, in relevant part, that an officer may approach and question any person if the officer can articulate a "reasonable suspicion" that the person may be involved in criminal activity. There is no dispute that trespassing is "criminal activity". *See* 625 ILCS 5/18c-7503(1)(a); 720 ILCS 5/21-3.

Agent Brody tells a very different story. According to Agent Brody, when he approached Jones on the tracks and requested to see his identification, Jones replied in an indignant tone with an expletive ("What is the problem, motherfucker? I am an employee of the railroad."). Jones flashed Agent Brody an I.D., but would not let him examine it, again using derogatory language in the process ("Look you white motherfucker, I have my ID right here."). Because of the potential danger associated with moving trains, Agent Brody suggested they move off the tracks to the sidewalk. Once off the tracks, Jones began yelling at Agent Brody, using more expletives and racial epithets (calling Brody a "white racist hillbilly motherfucker with a gun" and telling Brody he was going to get his "white ass fired").

A crowd of people from the neighborhood began to gather around Jones and Agent Brody. Jones then yelled for someone to call the Chicago Police, stating: "this white hillbilly motherfucker is harassing me". Agent Brody, fearing a physical confrontation between himself and Jones or the crowd, wisely decided to leave the scene. The Chicago Police and Special Agent Finger arrived moments after Agent Brody departed. While talking to Chicago Police, Jones again referred to Agent Brody in rather strong negative terms ("the motherfucker knows I'm an employee. He's just harassing me"). Special Agent Finger suggested that they return to the rail yard to clear up the issue. Jones asked the Chicago Police if he had "to get in this motherfucker's [Special Agent Finger's] car". The record does not disclose whether Jones returned to the rail yard with Special Agent Finger.

Jones was charged with insubordination and quarreling. An investigation of the incident was conducted by "upper management". None of the individuals involved in the altercation (Agent Brody and Special Agent Finger) were members of the investigation panel, nor did they

participate in the decision-making process. Superintendent of Commuter Operations Greg Larson and Director-Mechanical for Commuter Operations Rick Laue made the decision to terminate Jones.

Jones was represented by the Union, given the opportunity to make a statement, and call witnesses to testify on his behalf. Jones called no witnesses, giving only a statement. In that statement, Jones mentioned nothing about the encounter, charge, or investigation being racially motivated. Instead, Jones stated that the officers were patsies used to trump up charges against him because he was involved in "labor activities". Jones said, "I believe this is what this [incident] is about, about *my labor activities* at Cal Avenue, in the Coach Yard." (emphasis added).

Union Pacific maintains a graduated disciplinary policy, ranging from Level 1 to Level 5. Discipline begins with written reprimands and progresses to suspension and dismissal. Rule 1.6 of the Operating Rules applicable to employees prohibits, among other things, employees from being insubordinate to a supervisor and quarrelsome or discourteous to a fellow employee. A violation of Rule 1.6 is considered a Level 5 infraction, resulting in dismissal. According to Union Pacific, the policy does not allow the consideration of prior work history, discipline, or injuries when a Level 5 infraction is under consideration.[4]

Union Pacific's investigative and disciplinary authority chose to believe the officers' version of events and sus-

---

[4] In his recitation of the facts, Jones states that he had an exemplary attendance and work-related injury-free record. However, Jones leaves out the fact that he was previously dismissed in 1988 for insubordination (another Level 5 infraction), but reinstated under a leniency program in 1989. Regardless, neither of these facts were considered when Union Pacific decided to discharge Jones.

tained the charge of insubordination and quarreling; Jones was dismissed from his position. Jones then later filed suit in federal district court alleging racial discrimination. He moved for summary judgment and Union Pacific responded. The district court denied his motion and granted summary judgment in favor of Union Pacific.

## ANALYSIS

We review the grant of a motion for summary judgment *de novo*, viewing all facts in a light most favorable to the non-moving party to determine if issues of material fact necessitate a trial on the merits. *See Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001); *see also* FED. R. CIV. P. 56(c). Only genuine disagreement over material or dispositive facts will forestall summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). As we have stated before, "[i]n the employment discrimination context, summary judgment is warranted where 'the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer had discriminated against the plaintiff.'" *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002) (quoting *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570 (7th Cir. 1989)).

A.  *Summary Judgment*

Jones argues that the district court erred procedurally by granting summary judgment *sua sponte*. Union Pacific counters, stating that it did move for summary judgment in its' response to plaintiff's motion for summary judgment.

Although granting summary judgment *sua sponte* is a "hazardous" procedure which "warrants special caution" and is often unnecessary, it remains permissible. *Peckmann v. Thompson*, 966 F.2d 295, 297 (7th Cir. 1992); *Sawyer*

*v. United States*, 831 F.2d 755, 759 (7th Cir. 1987). When there are no issues of material fact in dispute, a district judge may grant summary judgment in favor of the non-moving party or may grant summary judgment even though no party has moved for summary judgment. *See Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994). The court may enter summary judgment *sua sponte*, as long as the losing party is given notice and an opportunity to come forward with its evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Goldstein v. Fid. and Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750 (7th Cir. 1996) ("The party against whom summary judgment is entered must have notice that the court is considering dropping the ax on him before it actually falls.").

Jones asserts that because the district court did not specifically state that it was considering the defendant's response brief as a cross-motion for summary judgment— or considering it *sua sponte*—that he was not on notice to come forward with all of his evidence. However, the facts belie this argument. Jones had moved for summary judgment and marshaled all the favorable evidence available in support of that motion. Moreover, Jones does not cite to any additional evidence to add to that which he brought forward in his original motion. Hence, the granting of summary judgment did not deprive Jones of the opportunity to present any beneficial evidence. *Cf. Peckmann*, 966 F.2d at 298.

Additionally, when Jones moved for summary judgment *both parties* were on notice that summary judgment was under active consideration. And the defendant's response to the plaintiff's motion for summary judgment put Jones on further notice by stating that the court should consider the response "in the nature of a cross-motion for summary judgment". Thus, Jones had an opportunity to respond to the defendant's cross-motion statement in *his* reply brief, but chose not to do so, and

raised no objection to the defendant's request for summary judgment.

Jones was on notice that summary judgment in Union Pacific's favor was a distinct possibility. Jones argued in his motion for summary judgment—it turns out ironically—that there were no genuine issues of material fact. The district court agreed with Jones and concluded there were no genuine issues of material fact, but in applying those facts to the law, granted summary judgment in favor of Union Pacific. Granting summary judgment—whether *sua sponte* or in response to defendant's cross-motion—did not deprive the plaintiff of any procedural safeguards. *See Goldstein*, 86 F.3d at 750-51; *see also Simpson v. Merch. Recovery Bureau, Inc.*, 171 F.3d 546, 549 (7th Cir. 1999).

B. *Discriminatory Job Assignments & Retaliation Claims*

Before reaching the merits of the discriminatory job assignments and retaliation claims, we must first determine whether they were properly presented for review. In his opening brief in this court, Jones only asserted the district court erred in granting summary judgment to Union Pacific *sua sponte* and by finding no evidence of discriminatory discharge. And in his reply brief, Jones argued that Union Pacific's argument—that Jones failed to raise the discriminatory work assignments issue in his EEOC charge—was waived in this court. However, the district court specifically granted summary judgment on the discriminatory work assignment claim by concluding that Jones had failed to show pretext for Union Pacific's proffered reasons for work assignments. Finally, neither the plaintiff's nor the defendant's briefs raise the issue of retaliation.

By neglecting to raise the discriminatory job assignments and retaliation claims in his opening brief, and by failing to argue that the district court's *actual* holding regard-

ing the discriminatory job assignments claim was in error, Jones waived review of these two issues. *See Sere v. Bd. of Tr. of the Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir. 1988) ("We consistently and evenhandedly have applied the waiver doctrine when appellants have failed to raise an issue in their opening brief.") (internal quotations and citations omitted); *Gabriel v. United States*, 30 F.3d 75, 78 (7th Cir. 1994); *cf. Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 667-68 (7th Cir. 1998) ("[W]e have stated that failure to address one of the [district court's] holdings results in a waiver of any claim of error with respect to the court's decision on that issue."); *Williams v. Leach*, 938 F.2d 769, 772 (7th Cir. 1991); *Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 678 (7th Cir. 1990).

C. *Discriminatory Discharge*

1. demonstrating a prima facie case

Jones's discriminatory discharge claim proceeded under the indirect method laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973).[5] In order to establish a prima facie case of discrimination the plaintiff is required to show that: (1) he is a member of a protected class; (2) his job performance was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) that other similarly situated employees not in the protected class were treated more favorably. *Flores v. Preferred Technical Group*, 182 F.3d

---

[5] At some point, Jones apparently also argued direct discrimination. Union Pacific rebutted this argument in its' appellate brief. However, the district court only analyzed the issue under indirect discrimination, and Jones abandoned any direct discrimination argument by arguing only pretext in his appellate brief. *Sere*, 852 F.2d at 287.

512, 515 (7th Cir. 1999). Jones clearly meets parts one (he is a racial minority) and three (he was terminated from his job). Part two requires Jones to show he was satisfactorily performing his job—which included adherence to Union Pacific's rules and regulations regarding employee conduct—and part four requires Jones to demonstrate that other employees outside the protected class were treated more favorably in similar circumstances.

We have often noted that establishing a prima facie case—which the plaintiff must do by a preponderance of the evidence—is a condition precedent to the pretext analysis. *E.g.*, *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). An employee alleging discrimination must demonstrate that he or she was meeting the expectations of the employer either before or up until their termination. *Cf. Lim v. Tr. of Ind. Univ.*, No. 01-4295, slip op. at 8-9 (July 19, 2002) (finding plaintiff failed to establish "that she was meeting IU's legitimate requirements regarding research and publishing."); *Salvadori v. Franklin Sch. Dist.*, No. 01-3829, 2002 WL 1301393, slip op. at 10-11 (7th Cir. June 14, 2002) (finding plaintiff "must show that she was performing well at the time of her termination."); *Plair*, 105 F.3d at 347.

The need to establish a prima facie case does not always arise; frequently employers concede the prima facie case and simply offer a non-discriminatory justification. And we often assume the existence of a prima facie case, or consider part two of the test along with the issue of pretext because many times the issues are intertwined. *See*, *e.g.*, *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002). In the latter example, we have opted to modify the flexible test provided by the Supreme Court in *McDonnell Douglas* to meet the facts of a particular case, analyzing part two of the test together with the related

issue of pretext. *See McDonnell Douglas*, 411 U.S. at 802 n.14; *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253-54 n.6 (1981); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999). In a few unusual cases, where the employee was fired for a sudden and egregious breach of company policy, we have even assumed part two of the test was met and moved immediately to the pretext issue. *See Flores*, 182 F.3d at 515; *Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001).

The facts of this case call for a simultaneous review of part two of the prima facie case and pretext—first reviewing the non-discriminatory reason for the employment action—because the reason for the plaintiff's removal is intertwined with the employer's legitimate expectations.

2. part two of the prima facie case & pretext

If the plaintiff establishes a prima facie case the burden of *production* shifts to the defendant to provide a non-discriminatory reason for the employment action. *See Burdine*, 450 U.S. at 255; *Pilditch v. Bd. of Educ. of the City of Chi.*, 3 F.3d 1113, 1117 (7th Cir. 1993) ("But this burden is also quite light; the employer need not persuade the court that he was actually motivated by the reason he gives and the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext."). Union Pacific stated that it fired Jones because of his conduct toward Agent Brody and Special Agent Finger which amounted to insubordination and quarreling, violating company policy. *See Flores*, 182 F.3d at 515 ("Insubordination is a legitimate, non-discriminatory reason for firing an employee."); *Plair*, 105 F.3d at 345 (same); *see also McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (upholding the district court's finding that insubordination was a legitimate non-discriminatory reason for plaintiff's discharge);

*Stringel v. Methodist Hosp.*, 89 F.3d 415, 418 (7th Cir. 1996) (same).

Since the defendant offered a non-discriminatory reason for the employment action, the burden of *proof* shifted back to the plaintiff to show pretext. *Burdine*, 450 U.S. at 256. Jones could satisfy this burden with direct or indirect evidence. To establish pretext, Jones must show that his race was *the determining factor* in his discharge, or that but for his race he would not have been discharged. *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). To meet this burden, Jones must produce "significantly probative admissible evidence" from which the trier of fact could infer that the employer's reason was false *and* that the actual reason was discriminatory. *King v. Preferred Technical Group*, 166 F.3d 887, 892-93 (7th Cir. 1999); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Jones proffers several details from the events in question as proof of Union Pacific's racial animus. Jones asserts that the initial decision to stop him was motivated solely by race. As support, Jones cites Agent Brody's description of him. Agent Brody's report provides that he: "observed a black male carrying a hand-bag walking south across the tracks towards 400 N. Francisco Street. The black, male was wearing a knit had and soiled clothing typical of the trespassers that frequent the yard."[6] Accord-

---

[6] Jones argues that Agent Brody's discriminatory animus, evidenced by the description quoted above, influenced the decision makers. We have long held that "statements by nondecision-makers cannot satisfy a plaintiff's burden of proving discrimination." *E.g.*, *Simmons*, 289 F.3d at 492. The cases cited by Jones in support of this argument provide a narrow exception when the person is actively involved in the disciplinary process. *See Russell v. Bd. of Tr. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 342 (7th Cir.
(continued...)

ing to Union Pacific, Agent Brody's stop of Jones was made because: trespassing in the rail yard is illegal and unsafe; Agent Brody was on watch for trespassers; Jones was alone and unfamiliar to Agent Brody; Jones was crossing the middle of the busy train yard more than forty minutes after the end of his shift using a route Agent Brody had never seen any employee use before; and his clothing and appearance matched that of prior trespassers.

While Jones agrees that the "use of the word 'black' was a neutral physical description"; he claims that Agent Brody wrongfully stereotyped him as a trespasser simply because he was black. However, the physical description is nothing more than that, and does not support Jones's contention. We have held before, and it would be a "sorry state" indeed if today we held that an unadorned physical description of a person which includes the person's race amounted to evidence of discriminatory intent. *Plair*, 105 F.3d at 348.

Next Jones asserts that pretext is evidenced by the fact that what he did does not qualify as insubordination or quarreling under the employee policy, therefore Union Pacific's proffered reasons for firing him are false. Jones's first argument is that he cannot be considered to be "quarrelsome" with another employee because the policy only applies to on-duty employees and he was off-duty and on his way home. In the district court, Jones also attempted to argue the entire confrontation occurred on the sidewalk. He has since admitted in his brief that the encounter began in the rail yard. Union Pacific interpreted its employee conduct policy to include actions of an employee,

---

[6] (...continued)
2001); *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000). In this case Agent Brody merely testified during the investigation process.

on or off-duty, while on railroad property. Jones provided no evidence to contradict this interpretation or to give examples demonstrating that the policy had never before been interpreted in that manner. Therefore, if Union Pacific believed Jones engaged in improper behavior toward Agent Brody, it could conclude that Jones violated company policy by being quarrelsome. *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) (holding that an employer's reasons for terminating an employee may be "mistaken, ill considered or foolish", but "so long as [the employer] honestly believed those reasons pretext has not been shown.").

Jones also claims that Agent Brody was not his "supervisor" under company policy because Brody did not supervise his actual work in the rail yard; that is, because Agent Brody was not his "supervisor" he could not be guilty of being "insubordinate" to a supervisor. Union Pacific interpreted the term "supervisor" in the company policy to include railroad police officers. The district court examined the common dictionary definition of "supervisor" because the policy did not define the term. The court found the term broadly included "anyone with direction or control over others." As Agent Brody is not only an employee of the rail yard, but also possesses the full power of a police officer while on rail property, the court concluded he had direction and control over others. Once again, Jones has failed to provide any evidence which demonstrates that this interpretation of the policy is unreasonable or blatantly false. Our reading of the definition and the interpretation by Union Pacific comports with that of the district court. As Jones was an employee on railroad property, he should have listened to Agent Brody and produced his identification. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001); *Walker v. Glickman*, 241 F.3d 884, 890 (7th Cir. 2001); *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389,

398 (7th Cir. 1998); *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir. 1997).

Finally, Jones asserts that he was not insubordinate or quarrelsome with Agent Brody. His argument is, in essence, that under the applicable summary judgment standards we must accept his version of the facts as true, and, as such, Union Pacific could have no legitimate reason for firing him. Jones misapprehends the applicable standards. While we do accept his version of the facts as true, the actual issue is not whether Union Pacific's account of events is correct, rather it is whether Union Pacific honestly believed the report of its officers.[7] "[A]rguing about the accuracy of the employer's assessment is a distraction . . . because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest.*'" *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (quoting *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1982) (emphasis in original)).

Jones cannot show that Union Pacific's interpretation and application of company policy was improper, nor can he demonstrate that the company's explanation (that it

---

[7] Jones attempts to cast this dispute as an issue of material fact which would preclude summary judgment; however, as shown above, the conflict is over immaterial and irrelevant facts Jones has attempted to present as relevant. This key difference has apparently even confused Jones. On page eighteen of his opening brief, Jones states that "[g]enuine issues of material fact exist", yet, in his conclusion, on page twenty-five, Jones maintains that "[i]t requires only a limited rehearsal of the previously cited evidence to demonstrate the absent [sic] [absence] of a material issue of fact". In addition, we again note that it was Jones who moved for summary judgment asserting there were no genuine issues of material fact remaining in conflict.

believed Agents Brody and Finger over Jones) was dishonest. *See Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). Furthermore, at the time the decision to discharge Jones was made, he said nothing about the charge or investigation being racially motivated. Rather, he stated that the officers were patsies used to trump up charges against him because he was involved in "labor activities". In fact, the only person who made negative comments about someone's race was Jones. And if Union Pacific believed its officers' version of events, it would have been remiss in not disciplining Jones for his conduct. *See Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir. 1994) (noting that racial epithets have "no place in the employment setting"). As the plaintiff could not demonstrate that the employment decision was the result of some prohibited consideration, this court will not "sit as a super-personnel department that re-examines an entity's business decisions." *Dale*, 797 F.2d at 464 (paraphrasing *Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir. 1980) (per curiam).

3. part four of the prima facie case

Jones also failed to establish part four of the prima facie case. He has not provided a single example of another employee (not in the protected class) being treated more favorably under similar circumstances. In his opening appellate brief, Jones failed to provide any evidence that met part four of the test. This constitutes waiver of the issue. *Sere*, 852 F.2d at 287. In his reply brief, Jones provides a cursory, unusable comparison to another employee who was fired for being involved in an altercation with another employee at work, *not for insubordination*. Jones also neglected to mention that two employees were terminated, one black and one white, and that both were later reinstated on a leniency basis, with the black

employee being reinstated first. Additionally, Jones omitted the fact that he was previously terminated for insubordination and he too was allowed to return on a leniency basis. *See supra* note 4. Hence, Jones failed to establish part four of the test.

## CONCLUSION

No issue of material fact, pertinent to the disposition of this case, remains in conflict. Jones failed to make out a prima facie case because he cannot show that other similarly situated employees outside the protected class were treated differently, or that the reasons offered for his discharge, insubordination and quarreling, were pretextual. During the investigation which resulted in his discharge, Jones stated that the encounter between himself and Agent Brody was orchestrated by management because of their displeasure with his "labor activities". Jones never mentioned his belief that the discipline was motivated by racial animus. The district court's grant of summary judgment is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*